**ADAM J. BREEDEN, ESQ.**
Nevada Bar No. 008768
**BREEDEN & ASSOCIATES, PLLC**
7432 W. Sahara Ave., Suite 101
Las Vegas, Nevada 89117
Phone: (702) 819-7770
Fax: (702) 819-7771
Adam@Breedenandassociates.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| DEREK MYERS, an individual,<br><br>     Plaintiff,<br><br>v.<br><br>JASON POTTS, an individual,<br><br>     Defendant. | CASE NO. 2:25-cv-1543-RFB-NJK<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Derek Myers, by and through his counsel, Adam J. Breeden, Esq. of Breeden & Associates, PLLC, moves for summary judgment on liability under Fed. R. Civ. P. 56, as there is no genuine dispute of material fact in this case and Plaintiff is entitled to judgment as a matter of law.

## I.     INTRODUCTION

This case is a public interest First Amendment case, filed by Myers after he discovered that the Defendant Potts, the Chief of the City of Las Vegas Department of Public Safety and Chief of the Las Vegas City Marshal's office, was restricting comments on his social media X account. Myers, a member of the media, presents a straightforward constitutional question: Consistent with the First Amendment, may a public official using his/her social media account for official purposes restrict comments on their posts to only approved accounts that the government actor has chosen to follow? The answer to this rather cutting-edge question of First Amendment law is a resounding "no."

The material facts are not in dispute. Defendant Potts' own posts and deposition testimony confirm that the account functioned as a channel for official Department communications, including coordination with government officials, reporting on Department operations, and public engagement. Defendant Jason Potts operates the @chiefjasonpotts X account and has used it to communicate matters relating to the Las Vegas Department of Public Safety.  At the same time, he has exercised control over that account to restrict which users may participate in the reply or comments space associated with his posts by determining which users could post replies within those threads and limited them to only accounts he has chosen to follow.

That conduct is not a matter of discretion or platform preference.  When a government official uses a communication channel, such as a social media account on X, to engage the public on official matters, the First Amendment prohibits him/her from selectively excluding speakers based on who they are or what they have to say.  By limiting participation in the reply space attached to his official communications, Defendant engaged in impermissible viewpoint or content-based discrimination. Because the relevant facts are undisputed and the constitutional violation is clear, Plaintiff is entitled to judgment as a matter of law on liability on his federal and state law causes of action.

## II.   HOW THE SOCIAL MEDIA WEBSITE X (FORMERLY KNOWN AS TWITTER) OPERATES

Preliminarily, Myers must explain how the social media site X operates and how commenting, re-posting/tweeting and blocking work on the site, in case the Court or judicial officer reviewing this Motion is not familiar. Such an understanding is critical to the legal issues in this case.

The social media website X (formerly known as Twitter) is a major social media site connecting people around the world. It is estimated to have 500,000,000 posts per day and 130,000,000 to 150,000,000 daily active users globally, according to estimates and limited published data. Ex. 1 at ¶ 2. On X, when a person signs up as a user, they adopt a Username (such as, in this case, "Jason Potts") and a unique X "handle" which begins with @ (such as, in this case, @chiefjasonpotts). Ex. 1 at ¶ 3. Users can then make posts, and other users may see those posts in

their feed.  Ex. 1 at ¶ 3. Users may also set their accounts to public or private, although the account at issue in this case has been set to public, meaning any other user can pull up that account and see what it has posted. Ex. 1 at ¶ 3.  Impressions of posts for major figures and accounts regularly exceed millions of impressions. Ex. 1 at ¶ 3. Users can choose to "follow" other accounts, making it more likely that the followed account's posts will appear in their feed, like choosing one's friends to see what they have to say. Ex. 1 at ¶ 4. A sample of X posts taken from *Exhibit 3* to this motion appears below so the Court can see both how both posts and comments typically publicly appear below them (below left: the X home page for @chiefjasonpotts; below right: a post by @chiefjasonpotts showing a public comment from another user below it):



Most of the First Amendment issues with these social media accounts involve how other users can interact with another user's post. Other users may press a heart-shaped button to "like" the post.  Ex. 1 at ¶ 5. Users may also comment directly on the post.  Ex. 1 at ¶ 5. If they comment

3

in this manner, other users may, in addition to reading the original post, read all comments. Ex. 1 at ¶ 5. In this manner, X is truly a digital public square.  One may review comments to see what others think of a particular account or comment and engage in public debate. Users may also "re-tweet" another user's post with or without a comment of their own.  Ex. 1 at ¶ 6. However, re-tweeting or re-posting only puts the original user's post on the new user's page.  Re-posting does NOT allow all viewers of the original post to see the comment or re-post; instead, one would have to navigate to the user account of the user who did the re-posting. Ex. 1 at ¶ 6. The difference between commenting on the original post (which can be seen on the original user's page) and re-posting (which is only seen on the re-poster's page with any comment) is critical. It is the difference between saying "you may speak what you like publicly in the town square for everyone to see" versus saying "you are free to speak in your own home with no one around to hear you."

Users may also block or restrict certain users or comments. Ex. 1 at ¶ 7. For example, (a) one may set their account so that all comments from any user are blocked (comments are switched off), (b) one may block certain users, meaning that other user cannot see or comment on the first user's posts, and (c) one may set the account to allow only accounts that the user follows to comment. Ex. 1 at ¶ 7. It is this blocking that leads to First Amendment issues because, as explained, a public official can create an account and, by blocking or adjusting comment settings, the public official may prevent free speech or criticism of the posts. This is exactly what occurred in this case. Shortly after Myers filed a separate lawsuit against Chief Potts and the City of Las Vegas for illegally performing operations outside their limited jurisdiction, Potts (who does not follow Myers) after years of allowing any public comments on his posts changed his settings so that only accounts he (Potts) followed could comment. Ex. 1 at ¶ 10. Ex. 2 at 60:11-61:11. This effectively allowed Potts to pick and choose who may comment publicly on the account, which is not permitted under the First Amendment.

## III.     STATEMENT OF FACTS

### A.     Defendant's Position and Authority

Defendant Jason Potts has served as the Chief of the Department of Public Safety for the City of Las Vegas since July 11, 2022.  Ex. B at 18:7-11.  He is the director of the Department and

the highest-ranking official within it, reporting to the deputy city manager.  Ex. B at 20:15-21; 20:20-21; 21:14-17; 22:14-17. He has direct supervision over and is responsible for running the Las Vegas City Marshals, the City's law enforcement agency of limited jurisdiction. Ex. B at 19-20. Potts' role is administrative.   He is responsible for establishing departmental direction, ensuring implementation of policies and accountability measures, and overseeing personnel within the Department.  Ex. B at 19:8-25; 20:1.

**B.** **The @chiefjasonpotts Account**

Defendant maintains an account on X (formerly Twitter) under the username @chiefjasonpotts, which he has used from approximately 2016 to the present, although he changed the user handle to @chiefjasonpotts after he was hired.  Ex. B at 33.  He currently maintains one X account.  Ex. B at 25:21-25. The account display includes a banner showing the City of Las Vegas Department of Public Safety and a departmental badge, and a profile photograph depicting Defendant in his Department of Public Safety uniform.  Ex. B at 30:18-24; 31:1-6; 32:11-20, pg. 3 of this Motion. The banner was modified after Defendant began his employment with the City and has remained unchanged since that time.  Ex. B at 32:1-10.  The profile includes the statement, "Proud to lead and serve with the men and women of the City of Las Vegas Department of Public Safety," along with related hashtags, and includes a link to an official Department of Public Safety website.  Ex. B at 35:8-13; 36:18-21.  The account does not identify itself as a personal account. Ex. B at 36:8-12. Nor does it contain a disclaimer that it is a personal account as recommended by the City of Las Vegas' official social media policy. Ex. B at 36-37, 91. Potts previously had access to a separate account associated with a prior employer but no longer controls or uses that account. Ex. B at 26:6-13.

Attached as *Exhibit 3* to this Motion are the subject posts made from the account during Potts' tenure at the City of Las Vegas.  As the Court can see for itself, the account has all appearances of an official account discussing official business of the City of Las Vegas Dept. of Public Safety.

**C.** **Defendant Potts' Control and Use of the Account**

Defendant Potts used the @chiefjasonpotts account to communicate official Department matters, including coordination with government officials, departmental operations, and public-

5

facing initiatives. The content of Defendant's own posts confirms that the account functioned as a channel for official Department communications. Just a few examples of hundreds, on November 19, 2022, Defendant posted regarding a department accreditation effort involving state and municipal leadership, stating: "Our CALEA Accreditation Manager & Team… critically important to us." Ex. 3 at DEF000193. Defendant likewise used the account to report Department participation in City-sponsored events, posting: "Yesterday, @CityOfLasVegas Department of Public Safety SERT team… participated in the Ward 3 Traditional Thanksgiving Lunch…" Ex. 3 at DEF000193. Additional posts reflect Defendant speaking in an official capacity about Department personnel and mission. For example, Defendant stated: "Our officers… Thank you for all your sacrifice." Ex. 3 at DEF000218. Defendant also posted: "Honoring and sending off Lt. Derek Major…" Ex. 3 at DEF000218. Hiring and other community events frequently appear in the posts, which are aggregated as Ex. 3.

These posts reflect Defendant Potts speaking in his official capacity and using the account as a channel for public communication regarding Department operations, personnel, and initiatives. Importantly, even the Defendant in Answers to Interrogatories confirmed the @chiefjasonpotts X account is, at least, a "mixed use" account for official government business. Ex. 4 at pg. 4-5, Interrogatory #6.

### D.     Application of City Policy and First Amendment Awareness

The City of Las Vegas social media policy applies to accounts used by City employees or officials, including "personal" accounts that perpetuate City business.  Ex. B at 83:1-4; 84:12-15. The @chiefjasonpotts account was not submitted to or approved by the City's Office of Communications prior to its use in Defendant's role as Chief.  Ex. B at 84:20-24.  Defendant did not receive training regarding the operation of social media accounts or compliance with applicable City policies. Ex. B at 90:5-6. Defendant did not receive guidance on First Amendment compliance for the account prior to this lawsuit, and his awareness of First Amendment concerns regarding the account arose only after the lawsuit was filed.  Ex. B at 87:6-16. However, as explained below it is the *content* of the social media posts, not the formality of who owns or controls the account, that controls the First Amendment analysis. There is no mistake that even if the account was originally

an account started personally by Chief Potts, its purpose morphed once he was hired by the City of Las Vegas into an exclusive or near-exclusive official account for City business.

### E.    Plaintiff Myers' Interaction with the @chiefjasonpotts Account

Plaintiff Myers is a member of the media. Declaration of Derek Myers Ex. 1 at ¶ 8. On March 27, 2025, he also filed a separate major putative civil rights lawsuit against Potts and the City of Las Vegas, alleging the City Marshals are knowingly performing law enforcement stops and arrests in excess of their limited jurisdiction under Nevada law. *Myers v. City of Las Vegas, et al.* 2:25-cv-00562-GMN-DJA.  Declaration of Derek Myers Ex. 1 at ¶ 9 This lawsuit garnered several local newspaper and television news features when it was filed. Declaration of Derek Myers Ex. 1 at ¶ 9 Myers has viewed posts on Defendant's @chiefjasonpotts account.  Declaration of Derek Myers Ex. 1 at ¶ 10 (the "Myers Decl."). He desired to comment on said posts as a member of the public and the press, potentially to publicly inquire about the operation of the City Marshals in a seemingly illegal way outside their limited statutory jurisdiction. Declaration of Derek Myers Ex. 1 at ¶ 10. However, several months after filing his lawsuit, he found that the comments on the @chiefjasonpotts X account had been restricted to accounts followed by Potts only. Declaration of Derek Myers Ex. 1 at ¶ 10. In other words, the account limited and hand-picked accounts that could comment. Most of the accounts followed were those of other law enforcement agencies or City-related accounts.

At the time relevant to this action in mid-2025, the account was specifically re-configured by Potts to limit who could comment publicly on his posts.  At his deposition, he admitted this fact. Ex. 2 at 60:11-61:11. Although he claimed this happened originally due to a vacation, he admitted he was aware of Mr. Myers and his lawsuit at the time and, in light of the filing of this suit, he stopped using the account at the City's request in August of 2025. Ex. B. at 42:22-43:7. Myers was not among the users permitted to reply directly to Defendant's posts, because he was not "followed" by Potts' account.  Declaration of Derek Myers Ex. 1 at ¶ 11. As a result of these settings, Myers and virtually every other member of the public were unable to post replies within the reply comment threads associated with Defendant's posts.  Declaration of Derek Myers Ex. 1 at ¶ 11.

## IV.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" only if a reasonable factfinder could return a verdict for the nonmoving party, and a fact is "material" only if it might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where, as here, the material facts are not in dispute, the question becomes one of law for the Court. *See id.* at 250-52. This is particularly true in First Amendment cases, where courts routinely resolve constitutional questions at summary judgment when the relevant conduct is established, and the issue is the legal significance of that conduct. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985) (forum analysis is a question of law); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (viewpoint discrimination presents a legal question).

Accordingly, where the operation of a government-controlled communication channel and the restrictions imposed upon it are undisputed, the constitutionality of those restrictions is properly resolved as a matter of law on summary judgment.

## V.    APPLICABLE FIRST AMENDMENT LAW AS TO SOCIAL MEDIA POSTS

The controlling United States Supreme Court decision on the First Amendment as it applies to the social media accounts of public officials is *Lindke v. Freed*, 601 U.S. 187, 198, 144 S. Ct. 756, 767 (2024). In *Lindke*, defendant Freed created a private social media Facebook page. Originally, he used the account to discuss family matters and his private life. Over time, he changed the page to a public page and was later appointed city manager of Port Huron, Michigan. These facts are nearly exact to what occurred with Potts' X account in this case. Freed then began using his Facebook page to post information related to his government job, including highlighting communications from other city officials and soliciting public feedback on issues of concern. While doing so, he would delete comments he felt were derogatory or stupid, thus restricting comments. However, a lawsuit arose when one member of the public, in particular, Lindke, began commenting on Freed's posts, criticizing Freed's handling of the COVID-19 pandemic. Freed blocked Lindke's comments, and Lindke then sued for violations of free speech. The US Supreme Court

acknowledged that "the line between private conduct and state action is difficult to draw" for such social media accounts, *Id*. at 188, but adopted a test to determine when a social media account crosses into an official account. According to *Lindke*, "a public official's social-media activity constitutes state action under §1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media. The appearance and function of the social-media activity are relevant at the second step, but they cannot make up for a lack of state authority at the first." *Lindke v. Freed*, 601 U.S. 187, 198, 144 S. Ct. 756, 767 (2024).

Notably, in *Lindke*, the US Supreme Court did not determine whether Freed, the city manager, crossed the line and violated the First Amendment; instead, that issue was remanded to the Sixth Circuit (which then deferred it to the District Court). However, the US Supreme Court did caution that blocking comments from the public altogether on a social media page which discusses official government business by a public official was unlikely to pass Constitutional muster, explaining:

> Blocking, however, is a different story. Because blocking operated on a page-wide basis, a court would have to consider whether Freed had engaged in state action with respect to any post on which Lindke wished to comment. The bluntness of Facebook's blocking tool highlights the cost of a "mixed use" social-media account: If page-wide blocking is the only option, a public official might be unable to prevent someone from commenting on his personal posts without risking liability for also preventing comments on his official posts. A public official who fails to keep personal posts in a clearly designated personal account therefore exposes himself to greater potential liability.

*Id*. at 204. Indeed, another leading case in this field which pre-dated *Lindke* is *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019) (finding that President Trump violated the First Amendment by selectively blocking comments on his X personal account, holding "the First Amendment does not permit a public official who utilizes a social media account for all manner of official purposes to exclude persons from an otherwise-open online dialogue because they expressed views with which the official disagrees."). In that highly persuasive opinion, the Court held that the President of the United States could not, consistent with the First Amendment, block certain persons from commenting on his allegedly "personal" X/Twitter page,

which he used to make statements of a governmental nature as if it were an official account. Essentially, once the President—or any state actor for that matter—uses an X account to make government-related posts, they may not selectively block comments or commenters.[1]

### a.  Actual Authority

Applying this framework to the present dispute, in regard to the first prong of the state actor test articulated in *Lindke*, "to determine whether a public official possesses authority to speak on behalf of the state, courts are to look to the sources listed in § 1983: 'statute, ordinance, regulation, custom, or usage.'" *Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181, 1188 (9th Cir. 2025) (citing *Lindke*, 601 U.S. at 199). In *Garnier*, the Court makes it clear that public officials' social media need <u>not</u> be formally authorized by the governmental entity. *Id.* at 1190. Instead, "[t]he focus at *Lindke*'s first step is on the authority of the individual official, not the official character of the social media account through which they speak." *Id.* The mere fact that the City itself did not approve or open the account itself is irrelevant to this inquiry. In fact, an official's authority to speak on behalf of the state may extend to social media even where the relevant state or local law does not contemplate social media at all." *Garnier,* 136 F.4th at 1190 (citing *Lindke*, 601 U.S. at 200). As Chief of the City of Las Vegas City Marshals, Defendant Potts frequently provides briefings and updates on behalf of the City Marshals through this X account. A simple Google search turns up countless instances of Potts speaking on behalf of the department. Moreover, he's the Chief of the Department of Public Safety and the Las Vegas City Marshals, it is not as if he has no supervisory or managerial authority. This type of authority alone is enough to satisfy the first prong of the *Lindke* test.

### b.  Purported Authority

---

[1] No one, in either *Lindke*, *Trump* or this case brought by Mr. Myers, has argued that a user such as Potts can't remove posts of a vulgar, profane or threatening nature. However, this is not the legal issue presented in this case.

In determining whether a social media account exhibits purported authority to speak on behalf of a state actor, courts look to whether the account is personal, official, or mixed-use. Where, as here, it is disputed as to whether the account is official, the court looks to the content and function of the posts to determine whether the official was exercising their authority to speak on behalf of the state. *Id.* at 1191. "Indicators that an official is exercising official authority in a post include, but are not limited to, the explicit invocation of state authority, a post's legal effect, the fact that a post shares official information not otherwise publicly available, and the use of government staff to make a post." *Id.* (citing *Lindke* at 203).

It is clear that at the very least Potts' account is mixed use if not outright official. Even in Answers to Interrogatories, Potts conceded that the account is at least mixed-use. Ex. 4 at Interrogatory #6, pgs. 4-5. The leading Ninth Circuit opinion on these issues is *Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181, 1188 (9th Cir. 2025) which applies *Lindke*. In *Garnier*, two public school district trustees had allegedly private Twitter (now known as X) accounts, which they would use to inform constituents about activities at the district's schools, actions of the Board, invite the public to attend Board meetings, solicit input about Board decisions, and comment on official business such as the termination of a school superintendent. When certain members of the public disagreed with these officials and blocked them from commenting, those plaintiffs sued for § 1983 freedom of speech violations and prevailed. As with *Lindke*, in *Garnier*, the Ninth Circuit found that regardless of how an account may have started (public or private), when the public official discusses government business on the account, they cannot restrict comments under free speech principles. As *Garnier* is nearly identical to what Potts did in this case, it seems clear that Myers' grievances are on-point and a First Amendment violation has occurred here.

A synthesis of these cases gives the following rules in this new social media First Amendment age: A public official discussing official or government business on a social media account has turned the account into a public forum subject to the First Amendment, regardless of whether the account is an official government-operated account or a so-called "personal" account. From that point, a public official using a social media account to discuss official or government business may either turn off all comments or allow all comments to posts, but may not use any

method to selectively block certain persons or groups of persons from publicly commenting. While the public official is under no obligation to post anything on social media, once they do, the public has a right to use the account to publicly comment on the official's post.

## VI.  ARGUMENT

Given this law, it is an inescapable conclusion that Potts violated the First Amendment rights of Myers and the public by restricting comments on posts to only preferred, followed accounts.

### A.  Defendant Potts Acted Under Color of State Law

#### 1.  Governing Standard

To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the challenged conduct is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). The inquiry focuses on whether the defendant exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988), *citing United States v. Classic*, 313 U.S. 299, 326 (1941). As previously explained, in the context of social media, the Supreme Court recently clarified that a public official acts under color of state law when he (1) possesses actual authority to speak on the State's behalf and (2) purports to exercise that authority through the challenged conduct. *Lindke v. Freed*, 601 U.S. 187, 202 (2024).  This inquiry is functional and fact-driven, focusing on how the account is used and whether the official invokes his governmental role in operating it. *Id.*

#### 2.  Defendant Potts Used and Controlled the Account in His Official Capacity

Defendant satisfies both elements of the *Lindke* framework.  As reflected in Defendant's own posts, he used the account as a channel to communicate official Department initiatives, coordinate with government officials, and report on law enforcement operations to the public.

First, Defendant possesses actual authority to speak on behalf of the City of Las Vegas in his role as Chief of the Department of Public Safety.  He is the highest-ranking official within the Department and is responsible for directing operations, implementing policy, and communicating with the public regarding departmental matters.  Ex. 2 at 19:8-25; 20:15-21; 21:14-17.

Second, Defendant used the @chiefjasonpotts account to exercise that authority.  The account prominently identifies Defendant by his official title, displays official Department of Public

Safety imagery, and links to an official City website.  Ex. 2 at 30:18-24; 31:1-6; 32:11-20; 35:8-13; 36:18-21.  Defendant modified the account after assuming his role as Chief to reflect that position.  Ex. 2 at 32:1-10; 34:22-25.

Defendant further used the account to communicate information relating to the Department of Public Safety or Las Vegas City Marshals office, including departmental activities, operations, and recruiting.  Ex. 2 at 84:12-15; 88:9-12, Ex. 3, generally.  The account is thus not merely personal; it is a channel through which Defendant conveys official information to the public.

Defendant also exercised direct control over the account.  He creates and posts content, accesses the account using both government and personal devices, and retains authority to edit, delete, and moderate content.  Ex. 2 at 39:4-10; 43:11-15; 44:3-9; 46:5-12.  That control is itself an exercise of the authority he brings to the account as a public official.

3.   The Challenged Conduct Was Undertaken Through That Official Authority

The conduct at issue - restricting participation in the reply space - occurred within the same account that Defendant used to communicate official matters and engage the public. Defendant exercised control over that account to determine which users could participate in the discussion associated with his posts by limiting which users could post replies within those threads.  Ex. 2 at 46:19-21.

Myers was not permitted to post replies within the reply threads associated with Defendant's posts, while other users were permitted to do so.  Defendant thus exercised control over who could participate in the interactive discussion accompanying his communications. Because Defendant used the account as a vehicle for official communication and exercised control over participation in that space, the challenged conduct is "fairly attributable to the State." *Lindke*, 601 U.S. at 202; *Lugar*, 457 U.S. at 937.  The fact that the account may also contain some personal content (a dubious argument to begin with because virtually every post concerns law enforcement activity) does not alter that conclusion, where, as here, Defendant invokes and exercises his official authority through the same channel.

The fact that the account may have contained some personal content does not alter this analysis. The relevant inquiry is whether Defendant used the account to carry out official functions

and communicate with the public in his governmental capacity. Where, as here, a government official uses an account for official communications and public engagement, the First Amendment applies to that use of the account. Accordingly, Defendant acted under color of state law.

### B.    Defendant Potts Operated a Government-Controlled Forum

#### 1.    Defendant Used the Account to Engage the Public

The First Amendment applies when the government creates or controls a space for expressive activity. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). Where a public official uses a communication channel not merely to broadcast information but to invite and facilitate public interaction, that space constitutes a forum for purposes of First Amendment analysis.

The relevant forum is the interactive reply space attached to Defendant's posts, which Defendant opened to public participation. Defendant used the @chiefjasonpotts account to communicate with the public regarding matters relating to the Department of Public Safety, including departmental activities, operations, and recruiting. Ex. B at 5–6; 84:12–15; 88:9–12. The platform itself provides an interactive structure, allowing members of the public to respond directly to Defendant's posts. Defendant did not use the account solely as a one-way channel.  By posting content on a platform designed for public reply and discussion, Defendant enabled public participation in the communication surrounding those posts.

#### 2.    The Interactive Reply Space Is the Relevant Forum

The relevant forum is not the account in the abstract, but the interactive space associated with Defendant's posts - the reply threads in which members of the public may respond to and discuss those communications. *See Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181, 1190-91 (9th Cir. 2025).  Defendant restricted who could reply to his posts, permitting some users to participate in the discussion while excluding most others, including Plaintiff.  This is the functional equivalent of allowing some speakers to participate in a public discussion while barring others from the same forum.

Defendant Potts exercised control over that space.  He retained the ability to determine which users could participate in the reply threads associated with his posts, including by blocking users

from responding.  Ex. B at 46:19-21. Once the Defendant used the account to communicate official information and opened the associated reply space for public interaction, he could not then selectively exclude speakers from that space while allowing others to participate. The First Amendment does not permit a government official to open a channel for public discussion and then control access to that discussion by selectively permitting some users to participate while excluding others.

### C.    Defendant Engaged in Impermissible Viewpoint Discrimination

#### 1.    Governing Principle

The First Amendment prohibits the government from restricting speech based on viewpoint or content-based discrimination in any forum it controls. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  Viewpoint discrimination is "an egregious form of content discrimination" and is presumptively unconstitutional.  *Id.* at 829-30. Content-based speech is also generally impermissible as it permits speech of certain types or from certain users, but not others. Any viewpoint or content-based restrictions in this case are particularly bad because the government official has allowed certain persons to respond (accounts he follows), but banned all others, like Myers and countless other members of the public.

This prohibition applies where a government official controls access to a forum for public expression, including interactive spaces associated with official communications.  Once such a forum is opened, the government "may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Cornelius*, 473 U.S. at 806.

#### 2.    Defendant Potts Selectively Excluded Speakers

Defendant Potts exercised control over the reply space associated with his posts by determining which users could post replies within those threads. Ex. B at 46:19-21.  Plaintiff was not permitted to post replies within those reply threads, while other users were permitted to do so. As a result, Plaintiff was excluded from participating in the reply space associated with Defendant's posts, while other favored/followed users remained free to reply to and engage with those posts.

This constituted a selective limitation on participation in a government-controlled space for public interaction. It constitutes either viewpoint or content-based restrictions.

### 3. The Exclusion Targeted Disfavored Speech

Plaintiff sought to use the platform to engage in commentary and criticism relating to Defendant and the Department of Public Safety.  Defendant excluded Plaintiff from the reply space associated with his posts while permitting other users to participate in the same discussion threads. By excluding Plaintiff from the reply space while permitting other users to participate in the same discussion threads, Defendant restricted Plaintiff's ability to engage in the interactive forum associated with Defendant's communications. Such selective exclusion of speakers from an otherwise open forum constitutes viewpoint discrimination.

The First Amendment does not permit a government official to open a space for public discussion and then deny particular speakers access to that space while allowing others to participate. The fact that Plaintiff could post commentary outside of the reply threads does not cure this restriction. The inability to participate in the reply space associated with Defendant's posts is a meaningful limitation on speech within the forum Defendant created.

### 4. Alternative Channels Do Not Cure Exclusion from the Forum

The fact that Plaintiff could express his views through other features of the platform does not alter the analysis.  The relevant forum is the reply/comment space associated with Defendant's posts.  Plaintiff was excluded from that space while others were permitted to participate. Free speech is useless if the government restricts you to speaking only in your own home, as opposed to letting you protest in a public space. The fact that Myers might have posted his criticisms regardless on his own page is too simplistic an approach and has been rejected by every social media First Amendment case.  For example, in *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019), it was irrelevant that the President's critics could have simply used their own pages (with less exposure) to post comments or re-post the President's post on their own accounts to comment. Instead, the First Amendment requires the government actor to allow the comments on their own posts. The First Amendment does not permit the government to exclude a speaker from a forum it controls on the ground that the speaker may express his views elsewhere.

16

### D. No Genuine Dispute of Material Fact Exists

Summary judgment is appropriate where the material facts are not in dispute, and the issue presented is one of law. Fed. R. Civ. P. 56(a). That is the case here. There is no genuine dispute as to how Defendant Potts used the account, how the reply restrictions operated, or that Plaintiff was excluded from the reply space. The remaining issues are purely legal and appropriate for resolution on summary judgment. Ex. 2 at 19:8-25; 20:15-21; 39:4-10; 44:3-9.

There is likewise no dispute that Defendant used the account to communicate matters relating to the Department and to engage with the public, nor that the account included official indicia and messaging tied to his role as Chief. Ex. 3 generally; Ex. 2 at 30:18-24; 32:11-20; 35:8-13; 84:12-15; 88:9-12. The Defendant admitted in Answers to Interrogatories that the account was a mixed-use account, although an inspection of the X posts involved shows it was almost exclusively used for official government purposes, and there are few, if any, posts that can be characterized as personal to Chief Potts or his family. For example, there is a total lack of posts about family birthdays, graduations, vacations, and similar personal matters.

There is likewise no dispute that Plaintiff was not permitted to participate in the reply threads associated with Defendant's posts while other users were permitted to do so. Finally, there is no dispute that Defendant exercised control over participation in the reply space associated with his posts, including by blocking users or certain commenters from that space. Ex. 2 at 46:5-12; 46:19-21. Because these facts are not disputed, the remaining question - whether Defendant's conduct violated the First Amendment - is a question of law appropriately resolved on summary judgment.

### E. Defendant Cannot Justify the Restriction Under Any Applicable Standard

Even where the government retains some ability to regulate access to a forum, it may not engage in viewpoint or content-based discrimination. *Rosenberger*, 515 U.S. at 829. That prohibition applies regardless of the type of forum at issue.

Defendant has identified no legitimate, viewpoint-neutral basis for excluding Plaintiff from the reply space associated with his posts. Nor is any content-based restriction limiting commentors to some but not all persons valid. The record reflects that Defendant exercised control over

participation in that space while using the account to communicate official matters and engage with the public.  Ex. 2 at 46:19-21.

To the extent Defendant Potts may contend that the account is "mixed use" or that participation in reply threads may be limited as a matter of discretion, those arguments do not permit the selective exclusion of speakers based on their speech either.  Where a government official opens a channel for public interaction, the First Amendment prohibits the use of that control to suppress disfavored viewpoints. This includes blocking an entire class of commenters (in this case, people Potts did not choose to follow). Because Defendant cannot identify a constitutionally permissible basis for the restriction, his conduct fails under any applicable standard.

## VII.    SUMMARY JUDGMENT ON NEVADA STATE LAW CLAIMS

Up to this point, Myers notes that his Motion sought summary judgment on his federal claims under 42 USC § 1983 for First Amendment violations.  However, Myers also filed Nevada State law Constitutional claims. The Nevada Supreme Court adopted state constitutional torts for violations of the Nevada constitution in *Mack v. Williams,* 522 P.3d 434 (Nev. 2022). *Mack* dealt specifically with Article 1, Section 18 of the Nevada Constitution (search and seizure). However, there is nothing in *Mack* which limits the retrospective monetary tort relief it provides to *only* that section of the Nevada constitution. Accordingly, it is for this Court to determine how it believes the Nevada Supreme Court would rule on the issue of whether a state constitutional tort claim also exists for violation of Art. I Sec. 9 of the Nevada state constitution, which states "Every citizen may freely speak, write and publish his sentiments on all subjects being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."). *E.g.*, *Giles v. Gen. Motors Acceptance Corp*., 494 F.3d 865, 872 (9th Cir. 2007). ("Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it."). While *Mack v. Williams* does specifically deal with a search and seizure violation and addresses whether a private right of action exists for that state constitutional violation, the opinion is not limited to search and seizure cases. *Mack v. Williams,* 522 P.3d 434 (Nev. 2022). Importantly, in *Mack*, the court formally adopted a three-part framework from the California Supreme Court case, *Katzberg v. Regents of Univ. of California*, 58 P.3d 339, 342-43 (2002), to

"approach, on a case- by-case basis, whether to recognize a damages action for violations of an at-issue self-executing constitutional provision." *Id*. at 442. Under *Katzberg*:

> At step one, a court considers whether the language or history of the constitutional provision at issue evinces an intent to authorize or withhold damages. Absent clear indication of intent, a court moves on to step two, a "constitutional tort analysis," which favors implying a constitutional remedy when doing so is consistent with the purpose of and necessary to enforce the provision. Finally, at step three, a court considers whether special factors counsel hesitation.

*Ramos-Quirarte v. Omandac*, No. 2:23-cv-01778-RFB-NJK, 2025 LX 215665, at *16-17 (D. Nev. Mar. 31, 2025) (internal quotations omitted).

Here, the plain language of Article 1, Section 9 neither authorizes nor prohibits money damages. Next, we move on to step two, a "constitutional tort analysis," "which favors implying a constitutional remedy when doing so is "consistent with the purpose of and necessary to enforce the provision." *Id.* at 17. This "constitutional tort analysis" relies on § 874 A of the Restatement (Second) of Torts. *Mack*, 522 P.3d at 445. Section 874A of the Restatement indicates that "a remedy should exist for violations of a prohibitory constitutional provision if such a remedy is (1) in furtherance of the purpose of the provision and (2) is needed to assure the effectiveness of the provision." *Id.* at 447 (citing Restatement (Second) of Torts § 874A (1979)). Here, a private right of action for violation of Article 1, Section 9 helps protect an important fundamental right, the freedom of speech. A private right of action for violations of Article 1, Section 9 not only provides an adequate remedy for those aggrieved but also holds those who violate the rights of others accountable. *See Ramos-Quirarte,* No. 2:23-cv-01778-RFB-NJK at *21-22 ("An implied right of action for damages ensures that a defendant's alleged violation is assessed by the higher standards required to protect and enforce the rights enshrined in the state constitution.").

As for the third step, "[t]he Nevada Supreme Court identified deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular types of damages as the relevant special factors to consider in recognizing a damages action." *Xiao Ye Bai v. Johnson*, No. 2:20-cv-2192-RFB-EJY, 2025 LEXIS 226956, at *15 (D. Nev. Mar. 31, 2025); *see also Mack*, 522

P.3d at 449. Here, to start, no legislative judgments regarding a damages action for constitutional violations exist to which to accord deference. As to Policy consequences, a private right of action for money damages here would not impose new limitations on government conduct, given the already developed status of freedom of speech jurisprudence. As was the case in *Mack*, being that the Legislature has already decided to presumptively waive the State's sovereign immunity, a private right of action for money damages would not implicate legislative fiscal policy. *See Mack,* 522 P.3d at 449 (citing *Echeverria*, 137 Nev., Adv. Op. 49, 495 P.3d at 476). The subject damages action presents no practical concerns as the Court routinely assesses personal injury type damages, similar to those sought here. Furthermore, Nevada courts regularly assess monetary damages as a means of redress for constitutional violations.

Moreover, this very District Court has already heard several other cases asserting Nevada Constitutional torts under *Mack* for other provisions of the Nevada constitution and found a private right to exist. *E.g., Vandecar v. Daniels*, No. 2:20-CV-02150-ART-BNW, 2024 U.S. Dist. LEXIS 176881, 2024 WL 4349430, at *4 (D. Nev. Sept. 30, 2024) (denying a motion to dismiss plaintiff's claims for damages under Article 1, §§ 6, 8, and 9 of the Nevada Constitution, noting that "Mack provides the framework for establishing whether a provision of the Nevada Constitution contains a right of action and whether that right of action permits damages actions"); *Cardenas-Ornelas v. Wickham*, No. 2:21-CV-00030-ART-VCF, 2024 U.S. Dist. LEXIS 178285, 2024 WL 4368152, at *5 (D. Nev. Sept. 30, 2024) (allowing plaintiff's claim under Article 1, Section 6 of the Nevada Constitution to proceed because the *Mack* "factors favor recognizing an implied right of action for damages"). *Xiao Ye Bai v. Johnson*, No. 2:20-cv-2192-RFB-EJY, 2025 LX 226956, at *6-7 (D. Nev. Mar. 31, 2025) (private cause of action under *Mack* for Art. I Sec. 6 of Nevada constitution for deliberate indifference to inmate medical needs). Of these cases, *Vandecar* is the most closely related as it concerned state constitutional torts in a correctional setting for "freedom of speech violations" under Art. 1, Sec. 9 of the Nevada constitution, the exact allegations contained herein. There is simply no reason to think that the Nevada Supreme Court might adopt constitutional tort claims for some, but not all, of Nevada's state constitutional rights. Freedom of speech is, of course, one of the most fundamental rights and a private action under the state constitution exists for such

violations. It is probably the most likely right the Nevada Supreme Court would find to implicate a constitutional tort second to search and seizure violations.

Based on the forgoing, a private right of action is appropriate for violations of Article 1, Section 9 of the Nevada Constitution. For the reasons set forth herein, this Court should also grant Myers summary judgment on those Nevada state Constitutional claims.

## VIII.   CONCLUSION

Defendant used the @chiefjasonpotts account to communicate with the public in his capacity as Chief of the Department of Public Safety and exercised control over who could participate in the discussion associated with those communications.  The material facts concerning Defendant's use of the account, his control over it, and his exclusion of speakers are not in dispute. The First Amendment does not permit a government official to open a channel for public interaction and then selectively restrict participation in a manner that distorts or controls the resulting public discourse. Nor does it permit the use of that control to exclude speakers without a constitutionally valid basis.

Because Defendant's conduct constitutes state action, involves a government-controlled forum for public interaction, and results in impermissible viewpoint discrimination, Plaintiff is entitled to judgment as a matter of law on liability under 42 U.S.C. § 1983. Accordingly, Plaintiff respectfully requests that the Court grant this Motion for Summary Judgment as to liability, with all issues relating to damages and remedies to be determined in further proceedings.

DATED this 8th day of April, 2026.

BREEDEN & ASSOCIATES, PLLC


/s/ Adam J. Breeden
_____
**ADAM J. BREEDEN, ESQ.**
Nevada Bar No. 008768
7432 W. Sahara Ave., Suite 101
Las Vegas, Nevada 89117
Phone: (702) 819-7770
Fax: (702) 819-7771
Adam@Breedenandassociates.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of April, 2026, I served a copy of the foregoing legal document **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** via the method indicated below:

| | |
|---|---|
| X | Through the Court's ECF/CM system on all registered users |
| | Pursuant to FRCP 5, by placing a copy in the US mail, postage pre-paid to the following counsel of record or parties in proper person: <br><br> NECHOLE GARCIA, ESQ. <br> PAUL MATA, ESQ <br> 495 S. Main Street, Sixth Floor <br> Las Vegas, NV 89101 <br> *Attorneys for Defendants* |
| | Via receipt of copy (proof of service to follow) |

An Attorney or Employee of the following firm:

/s/ *Kirsten Brown*

BREEDEN & ASSOCIATES, PLLC

22