**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

Derek Myers,

      Plaintiff

v.

Jason Potts,

      Defendant

Case No.: 2:25-cv-01543-JAD-NJK

**Order Granting Summary Judgment in Defendant's Favor on Federal Claim, Dismissing State-law Claim without Prejudice, and Closing Case**

[ECF Nos. 4, 17, 18]

Shortly after journalist Derek Myers filed a civil-rights lawsuit against the City of Las Vegas, Department of Public Safety Chief Jason Potts changed the settings on his X account so that only accounts he follows could directly reply to his posts. Myers contends that the account functioned as an official government-communications channel under the Supreme Court's *Lindke v. Freed*[1] framework and that the change excluded him and much of the public from an otherwise open forum in violation of the First Amendment and Article 1, Section 9 of the Nevada Constitution. So Myers seeks damages, declaratory relief, and an injunction barring Potts from restricting replies based on viewpoint.

Both parties move for summary judgment, with Myers seeking judgment only as to liability. I find that Myers has not carried his burden to show that Potts had actual authority to speak for the City, so Myers's federal claim fails regardless of remedy. I also find that qualified immunity would independently bar Myers's request for damages because existing law did not clearly establish that Potts's use of X's reply-limitation feature violated the First Amendment. So I grant Potts's motion for summary judgment on the federal claim, deny Myers's, and deny as moot Potts's motion to dismiss. And because this ruling resolves the only claim over which this

---

[1] *Lindke v. Freed*, 601 U.S. 187, 187 (2024).

court has original jurisdiction, I decline to exercise supplemental jurisdiction over the remaining state-law claim, dismiss it without prejudice to its refiling in state court, and close this case.

### Discussion

**A.      Standards for cross motions for summary judgment**

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[2]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[3]  If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[4]

Who bears the burden of proof on the factual issue in question is critical.  When the party moving for summary judgment would bear the burden of proof at trial (typically the plaintiff), "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial."[5]  Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[6]

---

[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[3] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[4] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

[5] *C.A.R. Transp. Brokerage Co. v. Darden Rests, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (citation and quotations omitted)).

[6] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (citation omitted).

When instead the opposing party would have the burden of proof on a dispositive issue at trial, the moving party (typically the defendant) doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual issue.[7]  The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[8]  "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[9]

**B.      Myers has not shown that Potts possessed actual authority to speak for the City.**

The United States Supreme Court held in *Lindke v. Freed* that the First Amendment reaches an official's social-media account-management actions only if the challenged conduct is fairly attributable to the state.[10]  In *Lindke,* James Freed created a private Facebook profile before he became Port Huron's city manager, later converted it to a public page, identified himself as the city manager, linked it to city contact information, and used the page for both personal posts and job-related communications.[11]  He posted about his family, faith, home projects, and dog, but he also shared city updates, highlighted communications from other city officials, solicited public feedback, and answered residents' questions about city affairs.[12]  When Kevin Lindke

---

[7] *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[8] *Celotex*, 477 U.S. at 322.

[9] *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[10] *Lindke*, 601 U.S. at 194.

[11] *Id.* at 191–93.

[12] *Id.* at 192–93.

criticized Port Huron's pandemic response in comments on Freed's posts, Freed deleted some comments and eventually blocked him.[13]  Lindke brought a civil-rights suit under § 1983, claiming that Freed had violated the First Amendment by excluding him from a public forum and "engaged in impermissible viewpoint discrimination by deleting unfavorable comments and blocking the people who made them."[14]

The High Court emphasized that public officials retain their own First Amendment rights, including the right to speak as private citizens about their jobs and to control speech on their personal platforms.[15]  So the Supreme Court established a two-prong framework for establishing that a public official's social-media activity constitutes state action: (1) the official must have possessed actual authority to speak for the state on the relevant subject, and (2) the official must have purported to exercise that authority in the social-media posts at issue.[16]

> **1.    _Lindke_ requires proof that the state actually authorized the official to speak for the government and that he purported to exercise that authority in the subject posts.**

To satisfy the first _Lindke_ requirement, a plaintiff must show that the official was "possessed of state authority" to speak for the government on the subject tied to the alleged censorship.[17]  That authority must come from one of the sources § 1983 identifies: statute, ordinance, regulation, custom, or usage.[18]  Written law can supply the authority directly; custom or usage can also suffice, but only if the practice is persistent and so permanent and well settled

---

[13] _Id._ at 193.

[14] _Id._

[15] _Id._ at 196–97.

[16] _Id._ at 204.

[17] _Id._ at 198.

[18] _Id._ at 200.

that it has the force of law.[19]  But actual authority does not require a statute, ordinance, or policy that specifically mentions social media.[20]  *Lindke* instead asks whether making official announcements is actually part of the job that the state entrusted the official to do, not whether the state authorized the official to use a particular platform.[21]  Courts must therefore determine the scope of an official's authority through "careful attention" to the relevant statute, ordinance, regulation, custom, or usage.[22]

The second *Lindke* prong examines how the official exercised that authority.  Even if an official possesses authority to speak for the government, state action can be found only if the challenged posts purported to exercise that authority.[23]  Indicators include expressly invoking official authority, making announcements with legal or governmental effect, disclosing information available only through public office, or relying on governmental personnel or resources to prepare or publish the communication.[24]

### 2.      *Myers has not met his burden to show actual authority.*

Potts argues that Myers has identified no statute, ordinance, regulation, municipal policy, delegation of authority, or well-established governmental custom authorizing the Department's director to make official statements on the City's behalf.[25]  Myers theorizes that Potts necessarily possessed actual authority because he serves as the City of Las Vegas Department of Public

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* at 201.

[24] *See id.* at 201–03.

[25] ECF No. 20 at 9.

5

Safety's director and highest-ranking official.[26]  The subjects of many of Potts's posts—hiring, recruiting, community events, enforcement actions, personnel matters, departmental partnerships, and public-safety messaging—are, according to Myers, matters that "fall squarely within the scope of matters that the Chief of the Department of Public Safety would ordinarily be authorized to address on behalf of the City."[27]  Myers also asserts that Potts "frequently provides briefings and updates on behalf of the City Marshals through this X account" and that "a simple Google search" reveals numerous examples of Potts speaking for the Department.[28]  But those assertions do not satisfy Myers's burden because he identifies neither evidence substantiating them nor the legal source, other than Potts's title, from which his communicative authority supposedly arose.[29]  And although *Lindke* recognized that an official's title may imply communicative authority if prior holders of the office have spoken on the state's behalf for so long that the authority has become "permanent and well settled,"[30] Myers identifies no evidence that directors of the Department of Public Safety have historically exercised or been recognized as possessing that authority.

---

[26] ECF No. 18 at 10; ECF No. 19 at 11.

[27] ECF No. 19 at 11.

[28] ECF No. 18 at 10.

[29] Myers cites Potts's deposition for the proposition that Potts was responsible for "communicating with the public regarding departmental matters." ECF No. 18 at 12 (citing ECF No. 18-3 at 19:8–5, 20:15–21, 21:14–17).  But the cited testimony describes Potts's managerial responsibilities as the Department's director—setting the Department's vision, supervising staff, attending meetings, ensuring accountability, and reporting to the deputy city manager. *Id.*  It does not identify public communications as one of his assigned responsibilities or otherwise show that the City authorized him to make official statements on its behalf.

[30] *Lindke*, 601 U.S. 187 at 200.

But in his reply in support of his summary-judgment motion, Myers offers the argument that the City's social-media policy is a source of communicative authority.[31]  That policy reflects the City's intent to use social media to provide information about City government, encourage dialogue with the public, and facilitate communication by City employees and officials.[32]  It also establishes policies and procedures governing the City's use of social media, including the creation and administration of official City accounts and the Office of Communications' support for employees' and officials' personal accounts used to communicate about City business.[33]  But what that policy does not do is assign the Department's director authority to make statements on the City's behalf.  The Ninth Circuit's recent decision in *Garnier v. O'Connor-Ratcliff*[34] illustrates why this matters.

In *Garnier,* school-district board president O'Connor-Ratcliff blocked parents from Facebook and Twitter pages that she used to communicate with constituents about activities at the district's schools and actions of the board, invited the public to attend board meetings, and solicited input about board decisions.[35]  In concluding that O'Connor-Ratcliff possessed actual authority to speak on the district's behalf, the Ninth Circuit relied on: (1) a California statute authorizing school boards to "inform and make known" to district residents the schools' educational programs and activities; (2) district bylaws expressly authorizing board members to disseminate official district information electronically, including meeting agendas, agenda packets, superintendent reports, and meeting reminders; and (3) another bylaw designating the

---

[31] ECF No. 27 at 2–3.

[32] ECF No. 20-5.

[33] *Id.*

[34] *Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181 (9th Cir. 2025).

[35] *Id.* at 1185, 1192.

board president as one of the board's representatives authorized to communicate public statements regarding district issues.[36]  Because O'Connor-Ratcliff served as both a board member and the board president, and because many of her challenged posts concerned the very subjects the bylaws authorized board members to communicate, the Ninth Circuit concluded that those posts fell squarely within her governmental "bailiwick."[37]

Equally instructive is what the *Garnier* court found insufficient.  O'Connor-Ratcliff argued that her social-media pages were not officially authorized because district regulations defined "official district social media platforms" as those approved by the superintendent or a designee, and there was no evidence that her pages had received that approval.[38]  The panel rejected that argument at *Lindke*'s first step because that inquiry focuses on the official's authority to speak, not on whether the particular account has been formally designated as an official governmental platform.[39]  California law and the district's bylaws independently authorized O'Connor-Ratcliff to communicate on the district's behalf, so whether she purported to exercise that authority through her particular pages was a separate question.[40]

The policy in the instant case certainly reflects the City's expectation that employees and officials will use social media to communicate with the public about City government.[41]  It explains that social media is intended to provide approved information concerning City government, encourage public dialogue, and facilitate discussion of City operations and

---

[36] *Id.* at 1188–89.

[37] *Id.* at 1189.

[38] *Id.* at 1189–90.

[39] *See id.* at 1190.

[40] *Id.*

[41] ECF No. 20-5 at 2.

services.[42]  It further recognizes that City employees and officials may publish articles, facilitate discussions, and communicate information through social-media platforms.[43]  But the policy also distinguishes between the City's general interest in public communication via social media and the authority to speak on the City's behalf.  Because the City "has a substantial interest and expectation in deciding what is 'spoken' on behalf of" the City on social-media sites, the policy provides that the Office of Communications determines which social-media accounts will serve as official City accounts, who may administer those accounts, what messaging and branding they will employ, and what content is appropriate for publication.[44]

Myers identifies no evidence that Potts's X account was ever approved, designated, or administered as an official City account under the City's social-media policy.  While the *Garnier* court rejected the argument that the absence of such approval necessarily defeats actual authority, it did so because California law and the district's bylaws independently and expressly vested the official with broad authority to communicate with the public.  Myers identifies no comparable source of authority here that bridges that gap for him.  Without another statute, ordinance, regulation, delegation, or well-settled municipal custom supplying that authority, Myers has not shown a genuine ability to carry his burden under *Lindke*.

**C.      Qualified immunity bars Myers's damages claim.**

The conclusion that Myers has not established state action disposes of his request for declaratory and injunctive relief for his § 1983 claim, but Myers also seeks monetary damages. Potts argues that he would be entitled to qualified immunity on that request for relief because

---

[42] *Id.*

[43] *Id.*

[44] *Id.* at 2–4.

Myers has not shown that existing law clearly established the unconstitutionality of Potts's use of X's reply-limitation feature in April 2025.[45]  Qualified immunity shields government officials "from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[46]  When a defendant raises this affirmative defense, the plaintiff bears the burden of demonstrating that both prongs are met.[47]  The evidence must be considered in the light most favorable to the plaintiff.[48]  Courts "have discretion to choose which qualified-immunity prong to address first" and, depending on the conclusion reached for the first-analyzed prong, "need not address the other."[49]

For a right to be clearly established, it must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right."[50]  The "rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority."[51]  The right may not be characterized "at a high level of generality,"[52] so the court must instead ask whether existing precedent gave every reasonable official fair warning that the challenged conduct was unconstitutional.  A right may therefore be clearly established

---

[45] ECF No. 17 at 14–16; ECF No. 20 at 2, 17–19; ECF No. 25 at 10–12.

[46] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[47] *Isayeva v. Sacramento Sheriff's Dep't.*, 872 F.3d 938, 946 (9th Cir. 2017).

[48] *Tolan v. Cotton,* 572 U.S. 650, 657 (2014).

[49] *Isayeva*, 872 F.3d at 946 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[50] *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015)).

[51] *Id.*

[52] *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742).

even in novel circumstances,[53] including if the unlawfulness of the conduct is "obvious"[54] or if the "intersection of multiple cases" places the unconstitutionality of the officers' conduct beyond debate.[55]  The ultimate question is "whether the state of the law at the time [gave] officials fair warning that their conduct [wa]s unconstitutional."[56]

Myers does not argue that there was a case on point, rather he relies on the principle that clearly established law may arise from the combined force of multiple decisions.[57]  In his view, longstanding First Amendment principles prohibiting viewpoint discrimination in government-controlled fora, combined with the Second Circuit's application of these principles to official social-media accounts in *Knight First Amendment Institute v. Trump*[58] and *Lindke*'s clarification of when those accounts constitute state action, collectively put every reasonable public official on notice that selectively restricting access to the interactive features of an official social-media account based on the official's discretionary follow list would be unconstitutional.[59]

The Second Circuit's decision in *Knight* arose from President Trump's use of his personal Twitter (now known as X) account as an official channel for presidential

---

[53] *See Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022).

[54] *See Hardwick v. County of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017).

[55] *See Polanco v. Diaz*, 76 F.4th 918, 930, 930 n.8 (9th Cir. 2023).

[56] *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) (cleaned up).

[57] ECF No. 19 at 26–27; *see, e.g., Ioane v. Hodges*, 939 F.3d 945, 957 (9th Cir. 2018) ("Taken together, the holdings from [four prior cases] put the unlawfulness of [the officer's] conduct beyond debate."); *Gordon v. County of Orange*, 6 F.4th 961, 971 (9th Cir. 2021) (holding that the relevant right was clearly established by the "principles drawn from" three cases); *Ballou v. McElvain*, 29 F.4th 413, 426–27 (9th Cir. 2022) (holding that a right was clearly established by the intersection of two cases).

[58] *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 230 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021), and *abrogated by Lindke*, 601 U.S. 187 (2024).

[59] ECF No. 19 at 26–29; ECF No. 27 at 7–10.

11

communications.[60]  Twitter permitted users to reply directly to a tweet, creating a public-discussion thread beneath the original post in which users could respond to one another and participate in an ongoing conversation.[61]  After several users criticized the President or his policies in those reply threads, the President used Twitter's blocking feature to block those users' accounts.[62]  Blocking prevented those users from viewing the President's timeline or tweets, replying to his tweets, retweeting or liking his tweets, and participating in the interactive discussion associated with them.[63]

The district court granted summary judgment for the plaintiffs, and the Second Circuit affirmed, concluding that excluding identified speakers from the interactive features of the President's official Twitter account based on their viewpoints violated the First Amendment.[64]  Although the Supreme Court later vacated the judgment as moot after President Trump left office,[65] Myers argues that *Knight* nevertheless provided the clearly established law public officials may not exclude speakers from the interactive features of official social-media accounts. The *Lindke* case then completed the analysis, he contends, by clarifying when a public official's social-media activity constitutes state action.  So together, First Amendment case law, *Knight*, and *Lindke* placed the constitutional question in this case beyond debate.

Those decisions may make it clear that a public official who acts under color of law may not engage in viewpoint discrimination by excluding speakers from the interactive features of an

---

[60] *Knight*, 928 F.3d at 234.

[61] *Id.* at 230–31.

[62] *Id.* at 234.

[63] *Id.* at 237.

[64] *Id.* at 238–39.

[65] *Biden*, 141 S. Ct. 1220.

official social-media forum through the blocking function. But they don't establish that every method of limiting participation in those interactive features is constitutionally equivalent. Potts did not block from his account Myers specifically.[66] Potts instead configured X's reply-limitation setting to permit direct replies only from accounts he followed. The result was that Myers and other users whom Potts did not follow could not post direct replies beneath Potts's posts, though they remained free to view those posts, repost or quote-post them with their own commentary, and tag Potts with their posts.[67] Myers argues that those remaining avenues of communication are not adequate substitutes because they did not permit him to participate in the same conversation occurring beneath Potts's post.[68] A quote-post appears on the user's own page, may reach a different audience, and is not part of the original discussion, he contends.[69]

Some court may ultimately hold that limiting direct replies is functionally indistinguishable from blocking critics from an official social-media forum. But the state of the law in April 2025 left room for reasonable officials to believe that existing precedent prohibited deleting comments or blocking identified critics while remaining unclear whether X's reply-limitation feature was governed by the same constitutional rule. Because neither controlling authority nor a robust consensus of persuasive authority had answered that question, Myers has

---

[66] ECF No. 17 at 8; ECF No. 17-2 at 57:5–8.

[67] ECF No. 17-2 at 60:4–10; *see also* ECF No. 17-8 at 10. *See also Knight*, 928 F.3d at 230 ("[A] user can post their own messages on the platform (referred to as tweeting). Users may also respond to the messages of others (replying), republish the messages of others (retweeting), or convey approval or acknowledgment of another's message by 'liking' the message. . . . When one user replies to another user's tweet, a 'comment thread' is created. When viewing a tweet, this comment thread appears below the original tweet and includes both the first–level replies (replies to the original tweet) and second–level replies (replies to the first-level replies).")

[68] ECF No. 19 at 22–24.

[69] *Id.*

not shown that Potts had fair warning that configuring his account in this manner violated the First Amendment. Potts is therefore entitled to qualified immunity from Myers's damages claim.

**Conclusion**

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment **[ECF No. 17] is GRANTED,** and the plaintiff's motion for summary judgment **[ECF No. 18] is DENIED.**

IT IS FURTHER ORDERED that the defendant's motion to dismiss **[ECF No. 4] is DENIED** as moot.

Because the disposition of Myers's federal claim leaves no remaining claim over which this court has original jurisdiction, this court declines to exercise supplemental jurisdiction over his remaining Nevada state claim. IT IS THEREFORE ORDERED that **the remaining state-law claim is DISMISSED without prejudice to its refiling in state court under 28 U.S.C. § 1367(c).** And with good cause appearing and no reason to delay, the Clerk of Court is directed to **ENTER FINAL JUDGMENT** for the defendant and **CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
July 13, 2026

14